**FOX ROTHSCHILD LLP**
Formed in the Commonwealth of Pennsylvania
By:    John C. Atkin, Esq.
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ  08648-2311
Tel: (609) 896-3600 / Fax: (609) 896-1469
jatkin@foxrothschild.com
*Attorneys for Plaintiff Strike 3 Holdings, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC,<br><br>          Plaintiff,<br><br>   v.<br><br>JOHN DOE subscriber assigned IP address 24.0.13.70,<br><br>          Defendant. | Civil Case No. 2:18-cv-10619-KM-CLW<br><br><br>***Document Filed Electronically*** |

## RESPONSE TO ORDER TO SHOW CAUSE

FOX ROTHSCHILD, LLP
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ  08648 2311
Tel: (609) 896 3600
Fax: (609) 896-1469
*Attorneys for Plaintiff,*
*Strike 3 Holdings, LLC*

Of Counsel and on the brief:
John C. Atkin, Esq.

i

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

LEGAL ARGUMENT ...........................................................................3

   I.    GOOD CAUSE EXISTS FOR EARLY DISCOVERY ...............................3

   II.   THE DC OPINION'S CONCERNS REGARDING PLAINTIFF'S
       TECHNOLOGY ARE BASELESS .............................................................5

     A. Numerous Courts Have Found IPP's Technology Works and that a
        Copyright Plaintiff Can Identify an Infringer .............................5

     B. The DC Opinion's Assertions of "Flawed" Detection Methods Are
        Highly Unlikely To Be Present Here. .........................................8

     1. Third-Party Use of VPNs is Irrelevant Because Plaintiff Does Not Sue
        Individuals Using VPN IP addresses. .........................................8

     2. Onion Routing and Spoofing of IP Addresses Are Impossible in
        Plaintiff's Cases. .......................................................................10

     3. Most Routers are Secured. ........................................................11

     4. Malware Cannot Cause the Ongoing Infringement of Plaintiff's Works
        Via the BitTorrent Network. .....................................................12

     5. The Infringer is Likely the Subscriber or a Household Member. ............12

   III. A PARTY'S RIGHT TO ENFORCE ITS COPYRIGHTS SHOULD NOT
       BE BASED ON THE COURT'S SUBJECTIVE OPINION OF A
       WORK'S CONTENT ...............................................................................14

     A. Plaintiff's Adult Motion Pictures are Copyrightable. ..............15

     B. The First Amendment Abhors Curtailing Free Speech Where Adult
        Entertainment is Not Obscene. ..................................................18

     C. Congress is Explicit When It Wants to Include Content Exceptionalism19

   IV. PLAINTIFF IS NOT A "COPYRIGHT TROLL" ....................................22

   V.   A PROTECTIVE ORDER STRIKES THE RIGHT BALANCE
       BETWEEN PLAINTIFF'S AND DEFENDANT'S RIGHTS..................30

CONCLUSION ...................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)....................................3

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) ...............................19, 26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................4

*Binderup v. Attorney Gen. United States of Am.*,
  836 F.3d 336, 374 (3d Cir. 2016)............................................................................19

*Bleistein v. Donaldson Lithographing Co.*,
  188 U.S. 239, 251 (1903) ........................................................................................15

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 798 (2011)................................18

*Christensen v. Harris Cnty.*, 529 U.S. 576, 587,
  120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ..............................................................17

*Clear Skies Nevada, LLC v. Kainu*,
  No. CV 16-811-AC, 2017 WL 4021121 (D. Or. Aug. 21, 2017) .........................7

*Devils Films, Inc. v. Nectar Video*,
  29 F. Supp. 2d 174 (S.D.N.Y. 1998)......................................................................15

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340, 345, 111 S. Ct. 1282, 1287, 113 L. Ed. 2d 358 (1991) ................16

*Fogerty v. Fantasy*, Inc., 510 U.S. 517, 526–27 (1994).........................................24

*Glacier Films (USA), Inc. v. Turchin*,
  896 F.3d 1033, 1036 (9th Cir. 2018)........................................................................7

*Hard Drive Prods., Inc. v. Does 1-90*,
  No. 11-03825, 2012 WL 1094653 (N.D. Cal. Mar. 30, 2012)............................26

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539, 558 (1985) ........................................................................................22

*In re Brunetti*, 877 F.3d 1330, 1340 (Fed. Cir. 2017) .............................................21

*JCW Investments, Inc. v. Novelty, Inc.*,
  482 F.3d 910, 914 (7th Cir. 2007)...........................................................................20

*Khumba Film (PTY.), Ltd. V. Does 1-14*,
  No. 14-02075, 2014 WL 4494764 (D. Colo. Sept. 12, 2014) .............................30

*Lapham v. Porach*, No. 06-6861CM,
  2007 WL 1224924 (S.D.N.Y. Apr. 25, 2007)........................................................20

*Malibu Media, LLC v. Bui*,
  No. CV 13-162, 2014 WL 12469955 (W.D. Mich. July 21, 2014) ......................6

*Malibu Media, LLC v. Doe*,
  No. 13-2864, 2013 WL 2392923 (E.D. Pa. May 31, 2013) ..................................3

*Malibu Media, LLC v. Doe*,
  No. 15-4381, 2015 WL 4923114 (S.D.N.Y. Aug. 18, 2015) ...............................26

*Malibu Media, LLC v. Doe*,
   No. 16-1739, 2017 WL 1050573 (D.N.J. Mar. 20, 2017) ..................................4
*Malibu Media, LLC v. Doe*,
   No. CV 15-2281, 2018 WL 5841866 (M.D. Pa. Nov. 8, 2018) ...........................7
*Malibu Media, LLC v. Doe*, No. CV 15-3504(JFB)(SIL),
   2016 WL 4444799 (E.D.N.Y. Aug. 23, 2016) ....................................................7
*Malibu Media, LLC v. Doe*, No. CV H-17-0485,
   2017 WL 3394611 (S.D. Tex. Aug. 8, 2017) ....................................................13
*Malibu Media, LLC v. Doe*,
   No., 2014 WL 2581168 (N.D. Ill. June 9, 2014) ..............................................25
*Malibu Media, LLC v. Does 1-11*,
   No. CV 12-7726 (KM), 2013 WL 1504927 (D.N.J. Apr. 11, 2013) ..................13
*Malibu Media, LLC v. Does 1-6*,
   No. 12-3142, 2012 WL 13015099 (E.D. Pa. Oct. 17, 2012) .............................17
*Malibu Media, LLC v. Does*,
   950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) .....................................................6, 24
*Malibu Media, LLC v. Huseman*,
   No. CV 13-02695-WYD-MEH (D. Colo. November 7, 2014) ............................6
*Malibu Media, LLC v. John Doe*,
   No. 14-10155-KBF (S.D.N.Y. Dec. 9, 2015) .....................................................7
*Malibu Media, LLC v. John Doe*,
   No. CV 14-10155-KBF (S.D.N.Y. Sept. 22, 2015) ............................................7
*Malibu Media, LLC v. John Does 1-16*,
   902 F. Supp. 2d 690, 701 (E.D. Pa. 2012) ........................................................17
*Malibu Media, LLC v. John Does 1-9*,
   8:12-cv-669-T-23AEP (M.D. Fla. 2012) ...........................................................13
*Malibu Media, LLC v. Tashiro*,
   No. CV 13-00205-WTL, 2015 WL 2371597 (S.D. Ind. May 18, 2015) ..............6
*Malibu Media, LLC v. Weaver*,
   No. CV 14-01580-VMC-TBM, (M.D. Fla. Dec. 11, 2015) .................................7
*Marbury v. Madison*, 1 Cranch 137, 1803 WL 893 (1803) .....................................2
*Matal v. Tam*, __ U.S. __, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017) .............20, 22
*Mitchell Bros. Film Grp. v. Cinema Adult Theater*,
   604 F.2d 852 (5th Cir. 1979)...........................................................15, 16, 19, 24
*New Jersey v. New York*, 523 U.S. 767, 813,
   118 S. Ct. 1726, 1751, 140 L. Ed. 2d 993 (1998) .............................................16
*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) ..................................20
*Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013) ....................................23
*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
   502 U.S. 105, 115 (1991) .................................................................................22

*Strike 3 Holdings, LLC v. Doe*,
  337 F. Supp. 3d 246 (W.D.N.Y. 2018) ...........................................................28, 29
*Strike 3 Holdings, LLC v. Doe*,
  No, CV 17-07058-EJD (N.D. Cal. Mar. 6, 2018) ...........................................8
*Strike 3 Holdings, LLC v. Doe*,
  No.  17-9659, 2018 WL 2371730 (S.D.N.Y. May 23, 2018).........................28, 29
*Strike 3 Holdings, LLC v. Doe*,
  No. 17-10285, 2018 WL 1932691 (D.N.J. Apr. 24, 2018) ....................................3
*Strike 3 Holdings, LLC v. Doe*,
  No. 17-13300, 2018 WL 783071 (D.N.J. Feb. 8, 2018) ......................................3
*Strike 3 Holdings, LLC v. Doe*,
  No. 18- 00571, 2018 WL 6166873 (W.D.N.Y. Nov. 26, 2018) ..........................27
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-00405 (D. Md. Nov. 26, 2018)...............................................................29
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-00410 (N.D.N.Y. Nov. 3, 2018) ............................................................29
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-00811, 2018 WL 3688401 (W.D. Pa. Aug. 3, 2018) ...............................3
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-01081 (W.D. Mich. Dec. 3, 2018) .........................................................28
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-01425-RCL (D.D.C. Aug. 28, 2018) ......................................................31
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-01605 (N.D. Tex Sept. 19, 2018)...........................................................28
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-01762 (E.D. Pa. Nov. 2, 2018)..........................................................28, 29
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-01874 (D. Md. Nov. 26, 2018)...............................................................29
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-02525 (N.D. Tex. Nov. 29, 2018) ..........................................................28
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-03763 (N.Y.E.D. Nov. 14, 2018).......................................................22, 29
*Strike 3 Holdings, LLC v. Doe*, No. 18-04111-JHS
  (E.D. Pa. Dec. 17, 2018) ..........................................................................6, 28, 29
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-07486 (N.D. Ill. Dec. 13, 2018) ............................................................30
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-07603 (N.D. Ill. Dec. 13, 2018) ............................................................30
*Strike 3 Holdings, LLC v. Doe*,
  No. 18-07696 (N.D. Ill. Dec. 13, 2018) ............................................................30

*Strike 3 Holdings, LLC v. Doe*,
   No. 18-431, 2018 WL 1942364 (D. Del. Apr. 25, 2018) ..................................... 3

*Strike 3 Holdings, LLC v. Doe*,
   No. 18-cv-02525, at 1 (N.D. Tex. Nov. 29, 2018) ............................................. 29

*Strike 3 Holdings, LLC v. Doe*,
   No. 17-2317-JAH(BLM) (S.D. Cal. May 18, 2018) ........................................... 8

*Strike 3 Holdings, LLC v. Doe*,
   No. 18-01015-CMH-MSN (E.D. Va. Oct. 24, 2018) .......................................... 7

*Strike 3 Holdings, LLC v. Doe*,
   No. 18-02019-YGR (N.D. Cal. Oct. 1, 2018) .......................................... 8, 28, 29

*Strike 3 Holdings, LLC v. John Doe*,
   No. 17-13285 (D.N.J. May 28, 2018) ................................................................ 27

*Strike 3 Holdings, LLC v. John Doe*,
   2018 WL 6027046 (D.D.C. Nov. 16, 2018) ........................................................ 1

*Strike 3 Holdings, LLC v. John Doe*,
   No. 17-12781 (D.N.J. Feb. 21, 2018) ............................................................... 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 17-13358 (D.N.J. Mar. 19, 2018) .............................................................. 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-00905 (D.N.J. June 1, 2018) ................................................................ 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-00927-KSH-CLW (D.N.J. June 5, 2018) .............................................. 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-02546 (D.N.J. June 18, 2018) .............................................................. 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-10640 (D.N.J. Oct. 3, 2018) ................................................................. 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-5566 (D.N.J. June 29, 2018) ................................................................ 27

*Strike 3 Holdings, LLC v. John Doe*,
   No. 18-922 (D.N.J. May 10, 2018) .................................................................. 27

*Strike 3 Holdings, LLV v. Doe*,
   No. 18-13658 (E.D. Mich. Dec. 20, 2018) ....................................................... 30

*Third Degree Films, Inc. v. Does 1-2010,*
   *2011 WL 4759283* (N.D. Ind. 2011) .............................................................. 13

*Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975) .................... 24

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ......................... 20

*United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003) ..................... 22

*W. Coast Prods., Inc. v. Does 1-351,*
   No. 4:12-00504, 2012 WL 2577551 (S.D. Tex. July 3, 2012) ............................ 31

**Statutes**

17 U.S.C. § 101 ...................................................................................................16

**Other Authorities**

3 McCarthy on Trademarks and Unfair Competition § 19:77.25 (5ᵗʰ ed.)..............20

*Compendium of U.S. Copyright Office Practices III* § 310.2 ................................17

James R. Alexander, *Chasing Echoes of Obscenity Exceptionalism in Copyright: Recent Swarm Cases*, 17 CHI.-KENT J. INTELL. PROP. 1, 35 (2018)....................15

Nimmer on Copyright § 2.17 (1980).............................................................17, 18

Martha C. Nussbaum, FROM DISGUST TO HUMANITY: SEXUAL ORIENTATION AND CONSTITUTIONAL LAW 2 (2010) ........................................................................18

Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 IOWA L. REV. 1105, 1108 (2015) ...................................................................................................23

Pere Manils, Chaabane Abdelberi, Stevens Le Blond, Mohamed Ali Kaafar, Claude Castelluccia, et al.. *Compromising Tor Anonymity Exploiting P2P Information Leakage*. [Research Report] 2010. https://hal.inria.fr/file/index/docid/471556/filename/TorBT.pdf  (last accessed on Dec. 21, 2018) ...............................................................................................10

Shyamkrishna Balganesh & Jonah B. Gelbach, *Debunking the Myth of the Copyright Troll Apocalypse*, 101 IOWA L.REV. BULL. 43, 48–49 (2015–2016)..23

## **INTRODUCTION**

On November 16, 2018, the Honorable Royce C. Lamberth, a Senior United States District Judge of the United States District Court for the District of Columbia, denied Plaintiff Strike 3 Holdings, LLC ("Plaintiff" or "Strike 3") the ability to uncover the identity of an anonymous Internet infringer and pursue Plaintiff's claim for copyright infringement.  Judge Lamberth's *sua sponte* decision (the "DC Opinion") was based mainly on three assertions, all of which were made, apparently, based on Judge Lamberth's outside-of-the-record investigation and without Strike 3 being provided an opportunity to respond.  First, Judge Lamberth contended that Strike 3's technology might somehow be inaccurate.  Second, Judge Lamberth stated that Strike 3's content was "aberrantly salacious" (without providing any explanation of how or why he reached that conclusion, which appears to be based on nothing more than a Google search).  Finally, Judge Lamberth, without any factual support ant apparently ignored the information set forth in Strike 3's application to be allowed to serve a subpoena on the Defendant's Internet Service Provider ("ISP"), concluding instead that Strike 3 was somehow a "copyright troll."  *See generally Strike 3 Holdings, LLC v. John Doe*, 2018 WL 6027046 (D.D.C. Nov. 16, 2018).  Again, all of these assessments were made without Plaintiff having the opportunity to address these criticisms.

As discussed below, Plaintiff's technology is reliable and the concerns outlined by the DC Opinion about "false positives" are unfounded.  Moreover, the DC Opinion's assertion that Plaintiff's content is somehow "aberrantly salacious" – based solely on the Court's flippant "just Google it" factual investigation, without any chance to respond – is simply incorrect.  Plaintiff operates the most awarded adult websites currently in existence and is often praised by mainstream media.  Regardless of the perceived merits of the content of Plaintiff's works, a *de facto* proscription on discovery would unconstitutionally burden Plaintiff's copyrights and ability to petition for redress.  *See Marbury v. Madison*, 1 Cranch 137, 1803 WL 893, *17 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").  Finally, Plaintiff has *never* been found to have acted improperly, and comparing it to other unrelated bad actors – based solely on the content of their works, rather than the character of their litigation conduct – is unwarranted and unfair.  Indeed, numerous other courts (after allowing Plaintiff to actually brief the issue) have specifically found that Plaintiff is not a "copyright troll" but, rather, is proceeding in these cases in a wholly appropriate manner, sensitive both to the privacy concerns of alleged infringers, and the need for its counsel to act beyond reproach in light of the history of unrelated bad actors.

Thus, for the following reasons, Plaintiff respectfully requests the Court reject the DC Opinion's findings and conclusions and allow Plaintiff to proceed with its case.

## LEGAL ARGUMENT

### I.     GOOD CAUSE EXISTS FOR EARLY DISCOVERY

Like the DC Opinion, courts in the Third Circuit examine Plaintiff's request(s) to conduct early discovery under the five-factor analysis found in *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010). *See* CM/ECF 7-1, at 10 (citing *Malibu Media, LLC v. Doe*, No. 13-2864, 2013 WL 2392923, at *1 (E.D. Pa. May 31, 2013)). Using this standard, every court in this Circuit that has reviewed Plaintiff's application for an early subpoena has found good cause exists for this limited early discovery. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 17-13300, 2018 WL 783071, at *2 (D.N.J. Feb. 8, 2018) ("There is good cause in this case to permit limited discovery prior to the Rule 26(f) conference."); *Strike 3 Holdings, LLC v. Doe*, No. 17-10285, 2018 WL 1932691, at *2 (D.N.J. Apr. 24, 2018); *see also Strike 3 Holdings, LLC v. Doe*, No. 18-00811, 2018 WL 3688401 (W.D. Pa. Aug. 3, 2018); *Strike 3 Holdings, LLC v. Doe*, No. 18-431, 2018 WL 1942364 (D. Del. Apr. 25, 2018). Indeed, although too voluminous to cite here, the CM/ECF dockets bear witness to the fact that, as of the date of this briefing, 271 members of the federal judiciary have collectively issued 1,845 orders

granting Strike 3's requests for early discovery. To say the DC Opinion is an anomaly is thus an understatement.

Indeed, unlike the DC Opinion, courts throughout the Third Circuit have rejected the argument that the mere risk of misidentification of an infringer in an otherwise plausible claim for copyright infringement negates Plaintiff's good cause for early discovery under *Arista*. "Plaintiff's burden at this stage is one of plausibility, not certainty." *Malibu Media, LLC v. Doe*, No. 16-1739, 2017 WL 1050573, at *2 (D.N.J. Mar. 20, 2017) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "It is plausible that files downloaded using a particular IP address were downloaded by the subscriber of that address [and the] possibility that a family member, guest, or neighbor may have downloaded the [motion pictures] does not render Plaintiff's claims implausible." *See id.* (denying motion to dismiss). "Further, if any defendant could quash a subpoena based on the mere possibility that someone else has used the defendant subscriber's IP address to perpetuate the alleged infringement' then a plaintiff would be unable to enforce its rights." *Id.* (internal brackets and quotations omitted).

The DC Opinion held that because Plaintiff's content is somehow "aberrantly salacious" and may contain "pitfalls associated with Strike 3's tracking and identification of infringers," Plaintiff should be treated differently than any other copyright plaintiff. DC Opinion at *4. As set forth below, Plaintiff's content

4

is not aberrantly salacious and, even if it were, its content does not form a basis to deny Plaintiff early discovery. Moreover, Plaintiff's technology can and has identified infringers countless times. Regardless, neither of these factors were considered by *Arista* when evaluating a defendant's privacy interest. Instead, *Arista* held that "we regard [Defendant's] expectation of privacy for sharing copyrighted [works] through an online file-sharing network as simply insufficient to permit him to avoid having to defend against a claim of copyright infringement." *Arista*, 604 F.3d at 124.

## II.   THE DC OPINION'S CONCERNS REGARDING PLAINTIFF'S TECHNOLOGY ARE BASELESS

### A.   Numerous Courts Have Found IPP's Technology Works and that a Copyright Plaintiff Can Identify an Infringer

Plaintiff uses IPP International U.G. ("IPP") to investigate, track, and record evidence of infringement over the BitTorrent network. IPP's methods and results are robust. Rights-holders have been filing BitTorrent lawsuits since 2010, and although Plaintiff only began litigating in late-2017, the law and technology concerning online piracy has developed considerably. Significantly, the accuracy of IPP's infringement detection system has been repeatedly established as having the ability to identify the alleged infringer.

In 2013, after presiding over the first bellwether trial on BitTorrent litigation, and hearing expert testimony regarding IPP's system, the Honorable

Judge Baylson of the Eastern District of Pennsylvania found that IPP's technology was valid and effective. *Malibu Media, LLC v. Does*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ("The technology employed by its consultants . . . was valid."); *accord Strike 3 Holdings, LLC v. Doe*, No. 18-04111-JHS, at *3 n.1 (E.D. Pa. Dec. 17, 2018) [CM/ECF 8]. In that case, after being identified using IPP's technology, the defendant admitted to downloading the copyrighted works as well as wiping his desktop computer to conceal the infringements. *Malibu Media, LLC*, 950 F. Supp. 2d at 788. This is not the only time IPP's system has been tested and found valid, and courts across the country have reviewed its findings, repeatedly holding favorably for rights-holders employing IPP's system.[1]

---

[1] The history of IPP's use, and its track record of success in the judiciary, runs deep. A year after the bellwether trial, a rightsholder secured summary judgment after IPP's system identified defendant's IP address and defendant admitted to using the BitTorrent network to download and distribute plaintiff's works. *See Malibu Media, LLC v. Bui*, No. 13-162, 2014 WL 12469955 (W.D. Mich. July 21, 2014). A few months later, in another BitTorrent case using IPP's system, plaintiff's expert located the copyrighted works on defendant's hard drive. *See Malibu Media, LLC v. Huseman*, No.13-02695 (D. Colo. November 7, 2014) [CM/ECF 43]. And the following year, plaintiff's expert discovered that defendant deleted thousands of relevant files before producing his hard drives. *Malibu Media, LLC v. Tashiro*, No. 13-00205, 2015 WL 2371597, at *16 (S.D. Ind. May 18, 2015), *report and recommendation adopted*, No. 13-205, 2015 WL 3649359 (S.D. Ind. June 11, 2015). In that same case, the Court ultimately imposed terminating sanctions against defendants for spoliation and perjury, and further noted that, "Plaintiff bolstered the strength of its infringement claim through testimony from [its investigator.]" *Id*. In Florida, plaintiff's expert, again, discovered evidence of the .torrent files for nearly all of the copyrighted works on defendant's computer along with evidence establishing defendant's deletion of

Although many of Plaintiff's cases against infringers are in their early

stages, with many cases still ongoing, Plaintiff routinely identifies the infringer.

By way of recent examples, Plaintiff is currently engaging in formal discovery

where defendants have admitted to using BitTorrent, a subscriber's roommate

admitted to the infringement,[2] and other defendants have admitted to infringement

_____

BitTorrent evidence.  *Malibu Media, LLC v. Weaver*, No. 14-01580, (M.D. Fla. Dec. 11, 2015) [CM/ECF 74-3].

IPP's technology provided the underlying evidence in a case where a forensic examination of a New York defendant's hard drive revealed that he had installed and used over eleven different file destruction software programs on his computer just days before producing his computer to plaintiff's expert.  *Malibu Media, LLC v. John Doe*, No. 14-10155, at \*6–8 (S.D.N.Y. Sept. 22, 2015) [CM/ECF 39].  Ultimately, in that matter, defendant admitted to the infringement and apologized to the plaintiff.  *Malibu Media, LLC v. John Doe*, No. 14-10155 (S.D.N.Y. Dec. 9, 2015) [CM/ECF 93].  Again in 2016, in two other copyright cases where similar technology identified infringing IP addresses, the defendants admitted to downloading the relevant copyrighted content with their respective identified IP addresses.  *See Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1036 (9th Cir. 2018); *Clear Skies Nevada, LLC v. Kainu*, No. 16-811, 2017 WL 4021121, at \*4 (D. Or. Aug. 21, 2017), *report and recommendation adopted*, No. 16-811, 2017 WL 4012960 (D. Or. Sept. 12, 2017).  Later in 2016, after an extensive evidentiary hearing before the Honorable Judge Steven Locke of the U.S. District Court for the Eastern District of New York, the Court found that plaintiff's investigators "offered credible testimony regarding the methods that [it] used on behalf of [plaintiff] in identifying the Doe Defendant's IP address as an infringer of its copyrighted material."  *Malibu Media, LLC v. Doe*, No. 15-3504, 2016 WL 4444799, at \*7 (E.D.N.Y. Aug. 23, 2016). *See also Malibu Media, LLC v. Doe*, No. 15-2281, 2018 WL 5841866, at \*3 (M.D. Pa. Nov. 8, 2018) (admitting to downloading multiple motion pictures).

[2] *See Strike 3 Holdings, LLC v. Doe*, No. 18-01015 (E.D. Va. Oct. 24, 2018) [CM/ECF 9].

through offers of judgment.[3]  Like other litigants that use IPP with valid results,

Plaintiff has and will continue to prevail in its cases.

### B.   The DC Opinion's Assertions of "Flawed" Detection Methods Are Highly Unlikely To Be Present Here.

The DC Opinion includes a laundry list of what it claims are "flaws" in

Plaintiff's technology.[4]  However, none of these circumstances are likely to be

present in Plaintiff's cases.

### 1.   Third-Party Use of VPNs is Irrelevant Because Plaintiff Does Not Sue Individuals Using VPN IP addresses.

The DC Opinion claims that Plaintiff's technology is "famously flawed"

because individuals may use "virtual private network[s.]"  *DC Opinion* at *1.

However, a third party's use of a virtual private network ("VPN") service has

nothing to do with Plaintiff's case against a subscriber of an IP address assigned

through an ISP.  To explain, a VPN protects a user's ISP-assigned IP address from

public disclosure by "replacing" the user's ISP-assigned IP address with the VPN's

---

[3] *See e.g.*, *Strike 3 Holdings, LLC v. Doe*, No, 17-07058 (N.D. Cal. Mar. 6, 2018) [CM/ECF 23]; *Strike 3 Holdings, LLC v. Doe*, No. 17-2317 (S.D. Cal. May 18, 2018) [CM/ECF 17]; *Strike 3 Holdings, LLC v. Doe*, No. 18-02019 (N.D. Cal. Oct. 1, 2018) [CM/ECF 36].

[4] Specifically, the DC Opinion suggests the risk of "virtual private networks and onion routing spoof IP addresses (for good and ill); routers and other devices are unsecured; malware cracks passwords and opens backdoors; multiple people (family, roommates, guests, neighbors, etc.) share the same IP address; a geolocation service might randomly assign addresses to some general location if it cannot more specifically identify another."  *DC Opinion* at *1.

IP address.  *See* Bunting Decl., at ¶ 23, attached hereto as "Exhibit A."  In fact, numerous VPN services publicly boast about this feature.[5]  VPN software allows a user to create an encrypted tunnel to a VPN server from which the internet traffic emerges unencrypted.  *See id.*  The VPN's internet-facing IP address becomes the user's public internet-routable IP address.  *See Id.*  Thus, if an infringer uses a VPN to engage in BitTorrent file sharing, other peers within the swarm (including IPP) are only able to identify the infringer by their public-facing internet-routable IP address – *not the VPN's IP address.  See id.*[6]  In this case, the IP address at issue belongs to the ISP.  Thus, it is self-evident that the infringer here did not use a

---

[5] Strong VPN, Pure VPN, and Express VPN are all notable VPN services and each company publicly admits that their VPN hides, masks, and replaces the user's true IP address.  *See* https://strongvpn.com/what-is-vpn/ (last accessed on Dec. 21, 2018) ("Conceal your location, personal identity, and more by masking your IP address with an IP address from StrongVPN."); https://www.purevpn.com/cnet-special.php?utm_medium=referral&utm_source=aff-18874-leadgen-cbslnk.cnet.com (last accessed on Dec. 21, 2018) ("Browse anonymously by hiding your IP address and avoid ISP or third party monitoring."); https://www.expressvpn.com/cnet (last accessed on Dec. 21, 2018) ("Stream or download anything, from any of our servers, anywhere on Earth, with your IP address hidden from prying eyes."); https://www.torproject.org/projects/torbrowser.html.en (last accessed Dec. 21, 2018).

[6] In fact, Plaintiff's computer forensic expert, Mr. Stephen Bunting, tested *this exact VPN theory.  See* Bunting Decl., at ¶ 24.  His test conclusively established that individuals accessing the BitTorrent network though VPNs are making their VPN's IP address (rather than their own ISP-assigned IP address) public via the BitTorrent network.  *See id.*

VPN to access the BitTorrent network.  Had he or she done so, Plaintiff would not seek early discovery from the ISP, because that would be insufficient (and irrelevant) to prosecute its claims.  Instead, Plaintiff would seek early discovery from Defendant's VPN Service.

### 2. Onion Routing and Spoofing of IP Addresses Are Impossible in Plaintiff's Cases.

The DC Opinion also notes the potential use of "onion routing spoof[ing] of IP addresses" by a defendant, without explanation, as some externality that may have rendered a false positive.  *DC Opinion* at *1.  First, it is nearly *impossible* to transmit a movie file through onion routing software, such as Tor,[7] and certainly not the volume of movies that Plaintiff alleges Defendant downloaded in this case.  *See* CM/ECF. 1-2.  This is because BitTorrent use through Tor overloads the Tor network.[8]  Thus these concerns are remote and unlikely to be present in this (or any) case.[9]

---

[7] https://www.torproject.org/projects/torbrowser.html.en (last accessed on Dec. 21, 2018).

[8] *See* Pere Manils, Chaabane Abdelberi, Stevens Le Blond, Mohamed Ali Kaafar, Claude Castelluccia, et al.. *Compromising Tor Anonymity Exploiting P2P Information Leakage*. [Research Report] 2010. https://hal.inria.fr/file/index/docid/471556/filename/TorBT.pdf  (last accessed on Dec. 21, 2018).

[9]  In addition, it is virtually impossible to spoof an IP address where an infringement detection system connects to peers using a TCP/IP connection and collects evidence of actual infringing transactions.  *See* Bunting Decl., at ¶¶ 20–22.

### 3.   Most Routers are Secured.

The DC Opinion also raised the possibility that a router may be insecure and, thus, accessible by anyone.  While unsecured routers were more commonplace fifteen years ago, *see* Bunting Decl., at ¶ 27, presently, ISPs have overhauled their practices to now provide secured wireless systems.  *See id.* Indeed, most combination modem/routers that ISPs rent to subscribers are preconfigured to operate with WPA2 security with a complex password already set.[10]  *See id*.  These devices are secure out of the box with strong encryption and complex passwords that are lengthy alpha numeric passphrases.  *See id*.

---

To explain, in order to spoof an IP address through a TCP/IP connection within the BitTorrent network, a very technically adept person would need to: (1) know a victim's IP address; (2) physically connect a computer into the same network as the intended victim; (3) possess the infringing file on their computer; (4) share the infringing file using BitTorrent software; (5) intercept each infringing transaction intended for the victim's IP address; and (6) operate software capable of rewriting tens of thousands of BitTorrent packets rapidly (as any delay could cause a time-out) for transmission to the infringement detection system.  *See* Bunting Decl., at ¶ 22.  Thus, while spoofing in the BitTorrent network is theoretically possible, Plaintiff and its experts are unaware of any available technology which would make this a probable, or even realistic, scenario.

[10] *See* http://www.verizon.com/support/smallbusiness/internet/fiosinternet/networking/fios-quantum-gateway/troubleshooting.htm (last accessed on Dec. 21, 2018); *see* https://www.att.com/ecms/dam/att/consumer/help/pdf/ATTNewInstallGuide_IPDSL_UVEP100083173.pdf (last accessed on Dec. 21, 2018); https://www.att.com/ecms/dam/att/consumer/support/landingpage/userguides/pdf/ATTWi-FiGatewayforNVG589-599-ATT9076.pdf (last accessed on Dec. 21, 2018); *see* https://www.xfinity.com/support/articles/view-change-wifi-password (last accessed on Dec. 21, 2018).

### 4. Malware Cannot Cause the Ongoing Infringement of Plaintiff's Works Via the BitTorrent Network.

The DC Opinion also suggests that Defendant may not be the infringer since malware can crack passwords and open backdoors.  This scenario is also highly improbable:  a third-party would have to install malware that prompts computers to download a BitTorrent client, download numerous torrent files, and initiate the download of dozens of Plaintiff's works over the course of countless months without detection.  This strains credulity.  Moreover, Plaintiff's computer forensic expert has never heard of such malware.  *See* Bunting Decl., at ¶ 28.  There is simply is no evidence to suggest that such an unusual malware exists or is present.

### 5. The Infringer is Likely the Subscriber or a Household Member.

The DC Opinion raised the issue that it is possible another individual with access to the subscriber's IP address (family, roommates, guests, and neighbors) could be the infringer.  But the length and sheer volume of infringement in this matter makes it extremely unlikely that the infringer is a guest or someone with mere passing access.  It is also unlikely that Defendant's router is unsecured because routers often are secured out of the box.  *See supra* Sec. II.B.3.  Finally, to the extent the infringer is a roommate or family member,[11] the subpoena response

---

[11] Plaintiff only uses geolocation technology to establish personal jurisdiction over the unknown defendant.  Indeed, Judge Lamberth agrees that reliance on geolocation services is sufficient to establish the district court's

would actually provide highly relevant information necessary to identify the liable party.[12]  As a result, all of these concerns are remote, if not practically impossible and should not be adopted by this Court to prevent Plaintiff from enforcing its copyrights.

---

personal jurisdiction over the unknown defendant.  *DC Opinion* at *2. Respectfully, if personal jurisdiction is not an issue, then it is unclear how geolocation rebuts or establishes defendant's liability.  Accordingly, the DC Opinion's concern regarding geolocation is misplaced.

[12] As courts have held, "[w]hether the individuals whose identities are sought by the subpoena are liable remains to be litigated and does not provide grounds upon which to quash the subpoena. The identity of individuals who may have violated the copyright is essential to resolving the copyright holder's claim." *Third Degree Films, Inc. v. Does 1-2010, 2011 WL 4759283* (N.D. Ind. 2011). Other courts agree, noting that "any concern about identifying a potentially innocent ISP customer, who happens to fall within the Plaintiff's discovery requests upon the ISPs, is minimal and not an issue that would warrant the Court to exercise its inherent power to govern these discovery matters by minimizing or prohibiting the otherwise legitimate, relevant, and probative discovery." *Malibu Media, LLC v. John Does 1-9*, No. 12-669, *5 (M.D. Fla. 2012); *See also Malibu Media, LLC v. Does 1-11*, No. 12-7726, 2013 WL 1504927, at *6 (D.N.J. Apr. 11, 2013) (finding "even if the information itself is not admissible evidence because the subscriber is not the alleged infringer, the information might lead to the discovery of other admissible evidence pertaining to the identity of the alleged infringer"); *Malibu Media, LLC v. Doe*, No. 17-0485, 2017 WL 3394611, at *1 (S.D. Tex. Aug. 8, 2017) (citations omitted) ("[A]lthough the disclosure of subscriber information may not reveal the actual infringers in these cases, it may nevertheless allow Plaintiff to identify the actual infringers.").

13

**III.      A PARTY'S RIGHT TO ENFORCE ITS COPYRIGHTS
SHOULD NOT BE BASED ON THE COURT'S SUBJECTIVE
OPINION OF A WORK'S CONTENT**

The second reason the DC Opinion denies Plaintiff its right to bring suit to

protect its copyrights is because it believes Plaintiff's movies are "aberrantly

salacious."  Although it is not clear how the court reached this conclusion, it

appears to have been based on an arbitrary, *ex parte* investigation, advising others

simply to "Google them at your own risk."  *See* DC Opinion at \*3.  This is

juxtaposed with virtually every mainstream publication to report on Plaintiff's

motion pictures, which have consistently praised Plaintiff as positively elevating

adult content.  Indeed, Plaintiff has been praised by *Rolling Stone* as more than just

an adult film company and instead "as a lifestyle brand with mainstream appeal."[13]

This would hardly lead an average observer to label Plaintiff's content as

---

[13] *See* https://www.rollingstone.com/culture/culture-features/versace-champagne-and-gold-meet-the-director-turning-porn-into-high-art-629908/. *Rolling Stone* also noted how Plaintiff is changing how the world views female adult performers, featuring them in such powerful roles as "action heroes, movie stars and athletes." *Id.  Forbes,* in an article entitled, "How One Pornographer Is Trying To Elevate Porn To Art" interviewed Greg Lansky, Strike 3's Chief Creative Officer (and three time winner of director of the year), who stated: "I believe [adult performers] are artists.  Unfortunately, they don't get the respect for what they do.  At the end of the day . . . it's performance art." https://www.forbes.com/sites/susannahbreslin/2017/07/20/pornographer-greg-lansky-interview/#13e02ae6593b. *AdAge* recently observed that Kanye West announced on "Jimmy Kimmel Live!" that Plaintiff's website "Blacked" was his favorite adult content.  https://adage.com/article/cmo-strategy/sfw-pornographer/314604.

"aberrantly salacious."  As one commenter noted, "[the Judge's] opinion that a

normal BitTorrent Plaintiff would be entitled to the requested [third] party

subpoena but one who trafficked in pornography was not, is a rather curious

interpretation of the constitutional guarantee of equal protection under the law."[14]

## A.   Plaintiff's Adult Motion Pictures are Copyrightable.

Copyright law has long upheld the principle of aesthetic neutrality, *see*

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.)

("It would be a dangerous undertaking for persons trained only to the law to

constitute themselves final judges of the worth of pictorial illustrations, outside of

the narrowest and most obvious limits.") and has never embraced "content

exceptionalism."  *See* James R. Alexander, *Chasing Echoes of Obscenity*

*Exceptionalism in Copyright: Recent Swarm Cases*, 17 CHI.-KENT J. INTELL. PROP.

1, 35 (2018) ("The sporadic claim that the rulings within or between districts

exhibit disagreement over content neutrality under [*Mitchell Bros. Film Grp. V.*

*Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979)] is simply without

substantiation.  In fact, excepting [*Devils Films, Inc. v. Nectar Video*, 29 F. Supp.

2d 174 (S.D.N.Y. 1998)], all subsequent rulings have been substantively consistent

with the argument and ruling in *Mitchell Bros.*, even while some in the same breath

repeat the axiom that content neutrality 'remains open question.'").

---

[14] *See* http://copyright.nova.edu/pornography/.

Importantly, the DC Opinion could not state that any court has ever found Plaintiff's content to be obscene.  *See DC Opinion* at *4.  Moreover, Congress has never embraced content exceptionalism.  Indeed, the Copyright Act does not mention any kind of content restriction.  *See generally* 17 U.S.C. § 101 *et seq.* "[S]ilence[15] is not ambiguity; silence means that ordinary background law applies," *New Jersey v. New York*, 523 U.S. 767, 813 (1998) (Breyer, J. concurring), and that background is "originality."  This is because "[t]he sine qua non of copyright is originality," and "[t]he vast majority of works make the grade quite easily . . . ." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (emphasis supplied) (citation omitted).  Plaintiff's motion pictures make the grade, and even the DC Opinion found that Plaintiff had made a *prima facie* case for copyright ownership.  *See DC Opinion* at *3.[16]

---

[15] Discussing the Copyright Act of 1909, the Fifth Circuit held "[t]he Act is not 'silent.'  Rather, the statutory language . . . is facially all-inclusive, within itself admitting of no exceptions.  There is not even a hint in the language . . . that the obscene nature of a work renders it any less a copyrightable 'writing.'  There is no other statutory language from which it can be inferred that Congress intended that obscene materials could not be copyrighted."  *Mitchell Bros.*, 604 F.2d at 854.

[16] The *Compendium of Copyright Office Practices III* [hereinafter *Compendium III*], the manual used by the Copyright Office to evaluate copyrightability, reaffirms that "[i]n determining whether a work contains a sufficient amount of original authorship, the U.S. Copyright Office does not consider the aesthetic value, artistic merit, or intrinsic quality of a work [and the] legislative history for the Copyright Act recognizes that 'the standard of originality . . . does not include requirements of . . . esthetic merit' and expressly states that Congress did not intend 'to enlarge the standard of copyright protection' to impose

Likewise, courts in the Third Circuit have declined to discriminate against adult content. *See, e.g. Malibu Media, LLC v. John Does 1-16*, 902 F. Supp. 2d 690, 701 (E.D. Pa. 2012) ("Neither the Supreme Court nor the Third Circuit has addressed whether pornography is eligible for copyright protection. However, other circuits that have addressed the issue have either determined or endorsed the view that the copyright laws are not content-based, and thus pornography is indeed eligible for copyright protection"); *Malibu Media, LLC v. Does 1-6*, No. 12-3142, 2012 WL 13015099, at *1 (E.D. Pa. Oct. 17, 2012) (same).

*Mitchell Bros.* takes account of the statutory structure of the Copyright Act, as well as the First Amendment and copyright policies, as they related to obscenity. Faced with the issue of content exceptionalism, *Mitchell Bros.* held that "obscenity is not an appropriate defense in an infringement action, whether piggybacked on

---

this requirement." *Compendium III* § 310.2 (quoting H.R. Rep. No. 94-1476, at 51 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5664)). *Compendium III* also expressly states that "Pornographic works may be registered with the U.S. Copyright Office, provided that they contain a sufficient amount of original authorship." *Compendium III* § 315. It continues, "a registration specialist will [generally] not examine a work or authorship to determine whether it contains material that might be considered obscene" citing *Mitchell Bros.* in support, which according to "the leading treatise on copyright [is] 'the most thoughtful and comprehensive analysis of the issue' . . . represent[ing] the prevailing view on this issue." *Jartech, Inc. v. Clancy*, 666 F.2d 403, 406 (9th Cir. 1982) (quoting Nimmer on Copyright § 2.17 (1980)). Although it is unclear what level of deference *Compendium III* receives, its well-reasoned analysis, informed in part from *Mitchell Bros.*, is binding "to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citation omitted).

the unclean hands rubric or introduced in some other manner." 604 F.2d at 863.

Investigating the "practical difficulties" content exceptionalism would impose on

copyright law and the First Amendment, the Fifth Circuit observed that "an

obscenity exception would create the dilemma of choosing between using

community standards that would (arguably unconstitutionally) fragment the

uniform national standards of the copyright system and venturing into the

uncharted waters of a national obscenity standard." *Id.* at 858; *see also Jartech*,

666 F.2d at 406 (concluding an obscenity bar would "in effect, authoriz[e] pirating

in another locale"). The intractable conflict of the obscenity doctrine is manifest

throughout First Amendment and copyright law. Of course, even if a work's

purported obscene nature had any relevance to its copyrightability (which it does

not), basic notions of due process require that Plaintiff be allowed to brief such

issues on a fully-developed factual record – which clearly did not happen in

connection with the DC Opinion.

### B. The First Amendment Abhors Curtailing Free Speech Where Adult Entertainment is Not Obscene.

To be sure, the DC Opinion expressed distaste for Plaintiff's content, "but

disgust is not a valid basis for restricting expression." *Brown v. Entm't Merchants*

*Ass'n*, 564 U.S. 786, 798 (2011) (Scalia, J.); *see generally* Martha C. Nussbaum,

FROM DISGUST TO HUMANITY: SEXUAL ORIENTATION AND CONSTITUTIONAL LAW 2

(2010) ("The politics of disgust is profoundly at odds with the abstract idea of a

society based on the equality of all citizens . . . ."). "It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) (collecting cases). "The Government may not suppress lawful speech as the means to suppress unlawful speech. *Protected speech does not become unprotected merely because it resembles the latter.* The Constitution requires the reverse." *Id.* at 255 (emphasis supplied). "In other words, the historical scope of the First Amendment—not Congress—determines the parameters of the right." *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 374 (3d Cir. 2016) (collecting cases), *cert. denied sub nom.*, __ U.S. __, 137 S. Ct. 2323, 198 L. Ed. 2d 746 (2017).

### C.   Congress is Explicit When It Wants to Include Content Exceptionalism.

*Mitchell Bros.* also observed that when Congress intended content exceptionalism to be part of an intellectual property regime, it is overt, as is the case with the disparagement and scandalous clauses in the Lanham Act.[17] 604

---

[17] "Congress has placed explicit content-related restrictions in the current statutes governing the related areas of trademarks . . . . The Lanham Act prohibits registration of any trademark that '[c]onsists of or comprises immoral, deceptive, or scandalous matter,'" *Mitchell Bros.*, 604 F.2d at 855, "or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute . . . ." 15 U.S.C. § 1052(a) ("scandalous clause" and "disparagement clause" respectively).

F.2d at 855.  These express exemptions to federal trademark registration were good law for decades until a pair of recent cases invalidated both clauses.

The Supreme Court recently reviewed the disparagement clause's bar to trademark registration in *Matal v. Tam*, __ U.S. __, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017).  Analyzing the denial of trademark registration[18] to a wordmark composed of a racial slur, the Court held the disparagement clause "offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Tam*, 137 S. Ct. at 1751 (Alito, J.).  With the weight of the First Amendment pushing down on the Lanham Act, the Court held that the disparagement clause to federal trademark registration was unconstitutional. *See id.*  This "was the first time that any part of the Lanham Act was held to be unconstitutional," 3 McCarthy on Trademarks and Unfair Competition § 19:77.25 (5th ed.), and the Court's invalidation of the disparagement

---

[18] Federal registration has very different effects for trademarks and copyrights.  "[E]ven if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement," *Tam*, 137 S. Ct. 1744, 1752 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)), or at state or common law.  In contrast, "[t]here is no common law copyright" since the Copyright Act of 1976 federalized the regime, *see Lapham v. Porach*, No. 06-6861CM, 2007 WL 1224924, at *6 (S.D.N.Y. Apr. 25, 2007) (citing 17 U.S.C. § 301), and although "[g]enerally, copyright protection begins at the moment of creation" *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007), a rightsholder cannot enforce its copyrights without registration.  *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010).

bar has rippled to another content exception found in the scandalous clause. *See In re Brunetti*, 877 F.3d 1330, 1340 (Fed. Cir. 2017) (noting criticism of its "continued reliance" on its scandalous jurisprudence "particularly in light of the many changes to First Amendment jurisprudence over the last thirty years"). Reviewing a denial of registration to a wordmark that was "undisputed[ly]" vulgar and "'one of the most offensive' English words," it "*conclude[d] the [scandalous] provision impermissibly discriminates based on content in violation of the First Amendment*." *In re Brunetti*, 877 F.3d at 1341 (emphasis supplied).[19] *Tam* and *In re Brunetti* show that Congress must be explicit when it wants to incorporate content exceptionalism into the law, and that even when it does so, Congress's proscriptions must still survive First Amendment scrutiny. Since "there is no principled basis to distinguish between the registration of trademarks and the registration of copyrights," *see In re Brunetti*, 877 F.3d at 1345, barring copyright protection for "aberrantly salacious" content is an unconstitutional abridgement of Plaintiff's right to free speech and to petition for redress.

---

[19] The parallels between the Lanham Act's "scandalous clause" and obscenity in copyright are even more striking. "Draft bills circulated by the Library of Congress and the Copyright Office in 1905 and 1906 would have denied copyright to 'any profane, indecent, *immoral, or scandalous* production,'" 2 *Patry on Copyright* § 3:43 (emphasis supplied) (citing Brylawski and Goldman, 2 Legislative History of the 1909 Copyright Act at xxiv, § 30(a) (1976)), sharing near identical language to that found in the Lanham Act's scandalous clause. This draft bill, however, never made it past the introductory stages. *See id.*

Such a restriction "is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) (citation omitted). The depravation of a copyright, which is an economic right, *see Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558 (1985), and the ability to enforce that right, unduly burdens its rights-holder. Moreover, cutting off relief to copyrights for being "aberrantly salacious" would pose an "unconstitutional condition" on a rights-holder's right to free speech and to petition the courts for redress. Under this doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit.*" United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003) (citations omitted). Accordingly, the government may not condition the grant or enforcement of a copyright because it disagrees with the content of Plaintiff's work. *See Tam*, 137 S. Ct. at 1761.

**IV.     PLAINTIFF IS NOT A "COPYRIGHT TROLL"**

Plaintiff is also not what has been nebulously labeled a "copyright troll." *See Strike 3 Holdings, LLC v. Doe*, No. 18-03763, at *1 (N.Y.E.D. Nov. 14, 2018) [CM/ECF 12] (finding that analogizing to other litigants' conduct is not "specific to this case [and] there is nothing in the record to suggest that improper conduct

22

has been engaged in by this Plaintiff against this Defendant"). There is, of course, no precise or agreed-upon definition of what constitutes a "copyright troll." Concerns tend to revolve around two issues: (1) whether the litigation actually benefits the creator rather than some third-party, *see, e.g.*, *Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013); and (2) whether the litigation is the party's primary source of income.  *See, e.g.*, Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 IOWA L. REV. 1105, 1108 (2015) (defining a "copyright troll" loosely as a party that is "more focused on the business of litigation than on selling a product or service or licensing their [copyrights] to third parties to sell a product or service").[20]  Neither of these concerns is at play here.

---

[20] This definition, either freestanding or as a cluster of attributes, has been criticized.

> Litigation as a revenue stream independent of any content creation thus seems to lie at the heart of Sag's problems with copyright litigation that he regards as trolling, an idea not adequately captured by his other criteria. This idea goes back to the assumption, then, that litigation is an avoidable evil in the copyright system. Yet, this idea is precisely what makes the case against copyright trolls hard to make and maintain.
> * * *
> While Sag may have strong intuitions about the viability of the argument, it would be well if he spelled out his arguments more clearly.

Shyamkrishna Balganesh & Jonah B. Gelbach, *Debunking the Myth of the Copyright Troll Apocalypse*, 101 IOWA L.REV. BULL. 43, 48–49 (2015–2016) (suggesting what qualifies a party as a "copyright troll" is its conduct in litigation and not its "status" as a litigant).

Consequently, Judge Baylson has previously sounded the horn on the hazards of blanket-labeling parties as trolls:

> [Plaintiff] is not what has been referred to in the media and legal publications, and in the internet blogosphere, as a 'copyright troll'— i.e., a non-producer who merely has acquired the right to bring lawsuits against alleged infringers.  Rather, [Plaintiff] *is an actual producer of adult films* and owns valid copyrights, registered with the United States Copyright Office, in its works.

*Malibu Media, LLC*, 950 F. Supp. 2d at 780–81 (emphasis supplied); *cf. Mitchell Bros.*, 604 F.2d at 862 ("Because the private suit of the plaintiff in a copyright infringement action furthers the congressional goal of promoting creativity, the courts should not concern themselves with the moral worth of the plaintiff.").

Plaintiff is not just the creator of the works-in-suit; it continues to create new motion pictures.  "Proceeds that Strike 3 receives from settlements go back into making the company whole, including investing in better pay for artists and performers, better quality productions, and hiring and providing benefits for employees."  CM/ECF 7-1, at 9 (citing Decl. of Greg Lansky (at ¶ 32)).  This is the very purpose of copyright law: "To promote the progress of" creative works.  U.S. CONST. Art. 1, § 8, cl. 8; *see Fogerty v. Fantasy*, Inc., 510 U.S. 517, 526–27 (1994) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor.") (quoting *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975)).  Indeed, Plaintiff's motion pictures support an expanding

workforce of nearly seventy-five employees, including editors and producers, all contributing to the creative marketplace.  *See* CM/ECF 7-2, at ¶ 14.

Additionally, Plaintiff "makes nearly all of its revenue from sales of subscriptions, DVDs, and licenses" and not from litigation.  *See id.* at ¶ 32. Plaintiff's litigation is not a primary source of revenue, but a way to compensate sales lost to piracy and to redirect infringers and potential infringers to the legitimate marketplace.  When violations of a party's rights are – as here – widespread, and infringers numerous, it is reasonable that Plaintiff would enforce its copyrights against the most egregious offenders.[21]  That defendants tend to

---

[21] Judge Kennelly provides a fitting analogy in *Malibu Media, LLC v. Doe*, No., 2014 WL 2581168 (N.D. Ill. June 9, 2014):

> It is certainly true that Malibu has filed a very large number of infringement suits in this district and in others. But that is what the holders of intellectual property rights do when they are faced with mass infringement. Courts in this district and elsewhere frequently get, for example, lawsuits by trademark owners against multiple websites that sell counterfeited products bearing the trademark owners' marks. By way of example, a review of the index of this district's filings reflects that Coach, Inc. which produces handbags, accessories, footwear, clothing, etc. bearing the company's trademarks, has filed 57 lawsuits in this district alone within the past four years, many of them naming dozens and indeed hundreds of entities as defendants.
> * * *
> As best as the Court can determine, not one of these has led to criticism of the intellectual property right holder for misusing its trademark, let alone to dismissal of a case for that reason. Presumably the reason is that although cases involving the doctrine of copyright misuse refer to suing on a copyright "hoping to force a

settle has no bearing on Plaintiff's conduct.  *See e.g.*, *Malibu Media, LLC v. Doe*, No. 15-4381, 2015 WL 4923114 at *1 n.4 (S.D.N.Y. Aug. 18, 2015) ("[T]here are any number of reasons free from coercion that a defendant may choose to settle, including culpability.").

Finally, Plaintiff *does* intend to litigate and does not "drop cases at the first sign of resistance."  *See DC Opinion* at *2.  This trope appears to originate with another litigant that "*admitted* at [a] hearing that [it has never] served a single defendant in one of [its] cases where early discovery has been granted."  *See Hard Drive Prods., Inc. v. Does 1-90*, No. 11-03825, 2012 WL 1094653, at *3 (N.D. Cal. Mar. 30, 2012).  While there have certainly been some bad actors in other cases, "[t]he prospect of crime . . . does not justify laws suppressing protected speech."  *Free Speech Coal.*, 535 U.S. at 245 (citation omitted).  To be sure, Plaintiff includes a section in its Motion for Leave explaining that it brings its

---

settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively," *Assessment Techs. of WI,* 350 F.3d at 647, the predicate for a misuse defense is an attempt to use the copyright monopoly to control something the monopoly does not protect. That element is missing from Doe's affirmative defense. *The Court is hard-pressed to see why Malibu Media's large-volume litigation should be treated differently from that of Coach or other intellectual property rights holders simply because Malibu's intellectual property rights involve pornographic films.*

*Id.* at *2 (emphasis supplied) (striking copyright misuse defense).

litigation "in good faith" while describing what internal procedures it has adopted to ensure respect for and deference to the rights and interests of all parties involved.  *See* CM/ECF 7-2, at 9.

Plaintiff has responded to various motions and orders, and amended complaints, throughout the country, including in this District.[22]  In fact, in motions to quash, defendants have "accuse[d] Plaintiff of having no real intention to litigate" but it has been held that "[t]he record before the Court does not support Defendant's accusations."  *Strike 3 Holdings, LLC v. Doe*, No. 18- 00571, 2018 WL 6166873, at *7 (W.D.N.Y. Nov. 26, 2018).  Indeed, Defendants across the country moving to quash Plaintiff's subpoenas have raised virtually identical objections contemplated in the DC Opinion, particularly regarding the possibility

---

[22] *See. e.g. Strike 3 Holdings, LLC v. John Doe*, No. 17-12781 (D.N.J. Feb. 21, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 17-13358 (D.N.J. Mar. 19, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-922 (D.N.J. May 10, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, 17-13285 (D.N.J. May 28, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-00927-KSH-CLW (D.N.J. June 5, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-00905 (D.N.J. June 1, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-02546 (D.N.J. June 18, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-5566 (D.N.J. June 29, 2018) (filing amended complaint and proceeded against the infringer); *Strike 3 Holdings, LLC v. John Doe*, No. 18-10640 (D.N.J. Oct. 3, 2018) (filing amended complaint and proceeded against the infringer).

of misidentification[23] and undue encroachment on their privacy interest.[24]  *No court* reviewing Plaintiff's cases has accepted these erroneous arguments as

---

[23] *Strike 3 Holdings, LLC v. Doe*, No. 18-02019, at 6 (N.D. Cal. Sept. 14, 2018) [CM/ECF 29] (concurrently-attached as Exhibit "B") ("While the Court is cognizant that an IP address is not perfectly correlated to the identity of an alleged infringer because it is possible for a third party to use a wireless network with or without the subscriber's permission, it is at least if not more likely that the subscriber is responsible for the alleged infringement in this case where Plaintiff has isolated 66 separate events where the same IP address was used to infringe its works.")*; Strike 3 Holdings, LLC v. Doe*, No. 18-04111, at 2 n.1 (E.D. Pa. Dec. 17, 2018) [CM/ECF 8] (finding Plaintiff's subpoena does not "offend[] basic fairness and due process" when defendant argued that Plaintiff did not verify its technology, noting that "[t]he type of IP address-identifying technology used by Strike 3's investigator in this case has already been found valid by at least one other court in this district [and] Defendant's argument as to fairness and due process lacks merit"); *id.* (rejecting argument that defendant "might not be the person responsible for infringing on Strike 3's content" noting that this argument "has already been rejected by several courts in this district" since it is not grounds to quash a subpoena); *Strike 3 Holdings, LLC v. Doe*, No. 18-01762, at 2 n.1 (E.D. Pa. Nov. 2, 2018) [CM/ECF 12] (citation omitted) (rejecting argument that "disclosing the name and address of the internet subscriber linked to the infringing IP address is insufficient to ascertain the identity of the accused infringer of Strike's copyright" and holding instead, "[t]o the contrary, this information is sufficiently tailored to lead to the identification of the infringing individual, even if it does not directly identify him or her"); *Strike 3 Holdings, LLC v. Doe*, No. 18-01605 (N.D. Tex Sept. 19, 2018) [CM/ECF 18] (denying motion to quash where defendant argued "that information linked to an IP address cannot identify the infringer"); *Strike 3 Holdings, LLC v. Doe*, No. 18-02525, at 1 (N.D. Tex. Nov. 29, 2018) [CM/ECF 17] (denying motion to quash based on argument that an IP address was insufficient to identify an infringer and used in a "fishing expedition"); *see Strike 3 Holdings, LLC v. Doe*, 337 F. Supp. 3d 246 (W.D.N.Y. 2018) (noting "[t]he record before the Court does not support Defendant's accusations [that Plaintiff is a copyright troll]" and "Defendant's general denial of liability is not a proper basis for quashing a subpoena") (collecting cases); *Strike 3 Holdings, LLC v. Doe*, No. 17-9659, 2018 WL 2371730, at *2 (S.D.N.Y. May 23, 2018) (citation omitted) ("[A] general denial of liability . . . is not a basis for quashing a subpoena."); *Strike 3 Holdings, LLC v. Doe*, No. 18-01081 (W.D.

Mich. Dec. 3, 2018) [CM/ECF 11] (same); *Strike 3 Holdings, LLC v. Doe*, No. 18-03763, at 4 (E.D.N.Y. Nov. 14, 2018) [CM/ECF 12] (same even when defendant argues that an "IP address could be used by many different people, and the subpoena may identify individuals who had no connection to the infringing activity"); *Strike 3 Holdings, LLC v. Doe*, No. 18-00405, at 1 (D. Md. Nov. 26, 2018) [CM/ECF 13] (noting factual defenses are not grounds to quash a subpoena); *Strike 3 Holdings, LLC v. Doe*, No. 18-01874, at 2 (D. Md. Nov. 26, 2018) [CM/ECF 17] (same).

[24] *Strike 3 Holdings, LLC v. Doe*, No. 18-00410, at 6 (N.D.N.Y. Nov. 3, 2018) [CM/ECF 20] (concurrently-attached as Exhibit "B"). ("Defendant's expectation of anonymity in viewing pornography on the internet is not sufficiently important to prevent Plaintiff from obtaining his identity in order to prosecute a copyright claim."); *Strike 3 Holdings, LLC v. Doe*, No. 18-02019, at 5 (N.D. Cal. Sept. 14, 2018) [CM/ECF 29] (noting "Plaintiff's conduct in this case and the dozens of similar cases it has filed in this District suggest that the unsavory tactics of earlier copyright litigants . . . are unlikely to come to fruition here" and holdings the potential "threat to the subscriber's privacy is necessarily reduced because the Court has already included several safeguards"); *Strike 3 Holdings, LLC v. Doe*, No. 18-03763, at 1–2 (E.D.N.Y. Nov. 14, 2018) [CM/ECF 12] (holding that, just as defendant's "description of [Plaintiff as a] copyright trolls" does not present "assertions [that] are specific to this case [and] there is nothing in the record to suggest that improper conduct" defendant's argument that Plaintiff's subpoena violates his or her privacy interests "are pure conjecture and not a basis to quash the subpoena"); *Strike 3 Holdings, LLC v. Doe*, No. 18-01762, at 3 n.1 (E.D. Pa. Nov. 2, 2018) [CM/ECF 12] (noting that "courts in this jurisdiction have held that . . . the potential embarrassment . . . of being associated with allegations of [downloading] hardcore pornography does not constitute an exceptional circumstance that would warrant quashing a subpoena served on a third-party ISP") (citation and internal quotations omitted); *Strike 3 Holdings, LLC v. Doe*, No. 17-9659, 2018 WL 2371730, at *2 (S.D.N.Y. May 23, 2018) ("Production of this narrow and limited set of information does not pose an undue burden [on defendant's privacy].”); *Strike 3 Holdings, LLC v. Doe*, 337 F. Supp. 3d 246 (W.D.N.Y. 2018) (rejecting defendant's argument that production of identifying information would subject him or her to an undue burden); *Strike 3 Holdings, LLC v. Doe*, No. 18-cv-04111, at 2 n.1 (E.D. Pa. Dec. 17, 2018) [CM/ECF 8] ("Defendant's name and address are not privileged or protected, and his argument must therefore be rejected."); *see Strike 3 Holdings, LLC v. Doe*, No. 18-cv-02525,

grounds to quash Plaintiff's limited early discovery.  Moreover, where, as here,

courts that have requested briefing on whether to adopt Judge Lamberth's

reasoning, these court have declined to do so.[25]  Thus, "'Plaintiff has a

constitutional right to file a lawsuit to and engage in discovery to determine

whether a defendant or someone using a defendant's IP address infringed on its

protected works,' provided Plaintiff has a good-faith basis under Rule 11 for

bringing suit." *Khumba Film (PTY.), Ltd. V. Does 1-14*, No. 14-02075, 2014 WL

4494764, at *2 (D. Colo. Sept. 12, 2014) (citation omitted).

## V.       A PROTECTIVE ORDER STRIKES THE RIGHT BALANCE BETWEEN PLAINTIFF'S AND DEFENDANT'S RIGHTS

Plaintiff never names a defendant in any of its action unless it amends its

complaint, and it only amends its complaints *after* it receives the requested

information back from the ISP and *after* it has conducted a further investigation

into that individual's liability.  Thus, when an ISP returns the name of a subscriber,

who may or may not be the infringer, this does not automatically result in a

"misidentification."  Plaintiff investigates all parties' liabilities according to its

---

at 1 (N.D. Tex. Nov. 29, 2018) [CM/ECF 17] (denying motion to quash based on argument that plaintiff's subpoena unduly invaded defendant's privacy).

[25] *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 18-07486 (N.D. Ill. Dec. 13, 2018) [CM/ECF 15]; *Strike 3 Holdings, LLC v. Doe*, No. 18-07603 (N.D. Ill. Dec. 13, 2018) [CM/ECF 15]; *Strike 3 Holdings, LLC v. Doe*, No. 18-07696 (N.D. Ill. Dec. 13, 2018) [CM/ECF 16]; *Strike 3 Holdings, LLV v. Doe*, No. 18-13658 (E.D. Mich. Dec. 20, 2018) [CM/ECF 7].

Rule 11 obligations and only amends its complaints to proceed against an infringer

if it has more to connect the infringer with the infringement other than just his or

her status as the subscriber.

> [I]t is reasonable to use an IP address as a starting point to obtain
> identifying information about a Doe Defendant who, through digital
> forensic means, has been tied to the torrent swarm in issue. The
> identifying information allows Plaintiff to make a good faith
> investigation into whether a particular individual has a reliable factual
> connection to the IP address associated with the swarm. If Plaintiff
> learns that the IP address is not a reliable identifier for a person, who
> Plaintiff in good faith can show committed an alleged legal wrong,
> Plaintiff has an obligation under Federal Rule of Civil Procedure 11 to
> cease pursuit of the claim against that individual.

*W. Coast Prods., Inc. v. Does 1-351*, No. 12-504, 2012 WL 2577551, at *4 (S.D.

Tex. July 3, 2012) (denying motion to quash).

In those circumstances in which someone other than the subscriber is more

likely the infringer (for example, a roommate), Plaintiff does not name the

subscriber.  And, hence, his or her name is never associated with the litigation or

Plaintiff's content on the public docket.  However, out of an abundance of caution,

and to "remove coercion from a defendant's calculation," *Malibu Media, LLC v.*

*Doe*, No. 15-4381, 2015 WL 4923114, at *1 n.4 (S.D.N.Y. Aug. 18, 2015),

Plaintiff has implemented a policy of requesting the court's entry of a protective

order allowing defendants to remain pseudonymous as "John Doe" during

litigation, not just during a motion to quash.  In fact, Plaintiff invited Judge

Lamberth to implement a protective order, *see Strike 3 Holdings, LLC v. Doe*, No.

18-01425-RCL, at 11 (D.D.C. Aug. 28, 2018) [CM/ECF 3-5], as it has done here as well.  *See* CM/ECF 7-1, at 17.  Although the DC Opinion expressed skepticism towards this approach because it "drags defendant[s] into court," *see DC Opinion* at \*3, the Court can enter such an order *sua sponte*, and many defendants have filed requests to remain pseudonymous *pro se* (which Plaintiff has never opposed). Indeed, Courts have acknowledged Plaintiff's respect for defendant's privacy.  *See Strike 3 Holdings*, No. 18-571, 2018 WL 6166873 at \*7 ("Plaintiff has repeatedly indicated that it respects Defendant's privacy concerns.").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court neither adopt nor follow the reasoning in Judge Lamberth's Order and Opinion (C.A. No. 18-1425 (RCL)) and instead allow Plaintiff to proceed with its case.

DATED: December 21, 2018                Respectfully submitted,

**FOX ROTHSCHILD LLP**

*Attorneys for Plaintiff,*
*Strike 3 Holdings, LLC*

By:   */s/ John C. Atkin, Esq.*
        JOHN C. ATKIN